# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTELLECTUAL VENTURES I LLC, and
INTELLECTUAL VENTURES II LLC,

    Plaintiffs,

    v.

NIKON CORPORATION, NIKON
AMERICAS INC., and NIKON INC.,

    Defendants.

C.A. No. 11-1025-SLR-SRF

JURY TRIAL DEMANDED

INTELLECTUAL VENTURES I LLC, and
INTELLECTUAL VENTURES II LLC,

    Plaintiffs,

    v.

CANON INC., CANON USA, INC. and
CANON SOLUTIONS AMERICA, INC.,

    Defendants.

C.A. No. 13-473-SLR

JURY TRIAL DEMANDED

## IV'S OPENING CLAIM CONSTRUCTION BRIEF
## FOR THE WI-FI PATENTS

Brian E. Farnan (Bar No. 4089)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com

Matthew D. Powers (admitted *pro hac vice*)
Steven S. Cherensky (admitted *pro hac vice*)
Stefani C. Smith (admitted *pro hac vice*)

Sam Kim (admitted *pro hac vice*)
Andrew C. Michaels (admitted *pro hac vice*)
Samantha A. Jameson (admitted *pro hac vice*)
Lital Leichtag-Fuks (admitted *pro hac vice*)
TENSEGRITY LAW GROUP LLP
555 Twin Dolphin Drive, Suite 360
Redwood Shores, CA 94065
Telephone:  (650) 802-6000
Fax:  (650) 802-6001

John M. Desmarais (admitted *pro hac vice*)
Alan S. Kellman (admitted *pro hac vice*)
Justin P.D. Wilcox (admitted *pro hac vice*)
John C. Spaccarotella (admitted *pro hac vice*)
Jeffrey S. Seddon (admitted *pro hac vice*)
Sarah E. Waidelich (admitted *pro hac vice*)
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400 (Tel)
(212) 351-3401 (Fax)
jdesmarais@desmaraisllp.com
akellman@desmaraisllp.com
jwilcox@desmaraisllp.com
ispaccarotella@desmaraisllp.com
jseddon@desmaraisllp.com
swaidelich@desmaraisllp.com

# TABLE OF CONTENTS

I.      Introduction ........................................................................................................... 1

II.     Legal Standards ..................................................................................................... 1

III.    Asserted Wi-FI Patents and Disputed Terms ....................................................... 1

　A.  The '870 Patent ................................................................................................. 2

　　1.  "single device" – Claims 1, 3, 10, 17-19 ................................................. 2

　　2.  "the demodulated data signal" – Claims 1, 10, 17 ..................................... 4

　　3.  "spread spectrum" – Claims 1, 10, 17 ......................................................... 5

　　4.  "comprising a single device having" – Claims 1, 10, 17 ........................... 6

　　5.  "analog receiver" – Claims 10, 17 ............................................................... 7

　　6.  "timer for transitioning between the BPSK demodulation and
　　　　the QPSK demodulation" – Claims 10, 17 ............................................... 8

　　7.  "direct sequence spread spectrum" – Claim 10 ............................................ 9

　　8.  "means for receiving an analog signal having modulated thereon
　　　　in a spread spectrum format a message having a header portion and
　　　　a data portion" – Claim 1 ..................................................................... 10

　　9.  "means for converting said analog signal into a digital signal" – Claim 1 ................... 11

　　10. "means for demodulating the header of the digital signal using
　　　　digital binary phase shift keyed (BPSK) demodulation and for
　　　　demodulating the data portion of the same message using quartery
　　　　phrase shift keyed demodulation (QPSK)" – Claim 1 ........................... 11

　　11. "means contained on said single device for timing a transition
　　　　from BPSK mosulation [sic] to QPSK modulation" – Claim 1 ................... 12

　　12. "means for adjusting said means for timing to account for
　　　　headers of variable length" – Claim 2 ..................................................... 13

　B.  The '944 Patent ............................................................................................... 14

　　1.  "data frame" – Claims 1, 7, 11 ................................................................... 15

　　2.  "transmitting said first signal in accordance with a first modulation
　　　　scheme on said shared-communications medium after said
　　　　second signal" – Claim 7 ....................................................................... 16

　　3.  "transmitting said third signal in accordance with said second modulation
　　　　scheme on said shared-communications medium after said first signal" – Claim 19 ... 16

　C.  The '195 Patent ............................................................................................... 17

　　1.  "configured to" – Claim 1 ........................................................................... 17

　　2.  "channel impulse response estimate obtainable from the first portion
　　　　is reusable for acquisition of the second portion" – Claim 1 ..................... 18

3.  "transmitter maintains power, carrier phase, carrier frequency, timing, and multi-path spectrum" – Claim 2 ................................................................................. 19

4.  "sufficiently long to achieve desired spectral characteristics and sufficiently short to minimize complexity" – Claim 7 .................................................... 20

5.  "kernel" – Claims 9, 11, 13, 16 ....................................................................................... 20

<u>**TABLE OF AUTHORITIES**</u>

CASES

*Aspex Eyewear v. Marchon Eyewear,*
   *672 F.3d 1335 (Fed. Cir. 2007)*.................................................................................... 18

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,*
   *289 F.3d 801 (Fed. Cir. 2002)*...................................................................................... 3

*Crystal Semiconductor v. Tritech Microelectronics,*
   *246 F.3d 1336 (Fed. Cir. 2001)*.................................................................................... 7

*Genentech, Inc. v. Chiron Corp.,*
   *112 F.3d 495 (Fed. Cir. 1997)*...................................................................................... 7

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
   *358 F.3d 898 (Fed.Cir. 2004)*....................................................................................... 4

*Markman v. Westview Instruments, Inc.,*
   *52 F.3d 967 (Fed. Cir. 1995)*........................................................................................ 1

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
   *521 F.3d 1351 (Fed. Cir. 2008)*.................................................................................... 1

*Phillips v. AWH Corp.,*
   *415 F.3d 1303 (Fed. Cir. 2005)*.................................................................................... 1

*Ravo & Nicolo v. Covidien LP,*
   *C.A. No. 11-CV-1637, 2014 WL 198551 (W.D. Pa. Jan. 16, 2014)*.......................... 3

*S3 Inc. v. nVidia Corp.,*
   *259 F.3d 1364 (Fed. Cir. 2001)*....................................................................... 10, 13, 14

*Sprint Commc'ns Co. v. Comcast Cable Commc'ns LLC,*
   *C.A. No. 11-CV-2684, 2014 WL 5089401 (D. Kan. Oct. 9, 2014)*........................... 3

*Superspeed, L.L.C. v. Google, Inc.,*
   *C.A. No. 12-CV-1688, 2014 WL 129225 (S.D. Tex. Jan. 14, 2014)*......................... 3

*Synopsys Inc. v. Mentor Graphics Corp.,*
   *C.A. No. 12-CV-06467, 2014 WL 4760362 (N.D. Cal. Sept. 24, 2014)*................. 6, 9

*U.S. Surgical Corp. v. Ethicon, Inc.,*
   *103 F.3d 1554 (Fed. Cir. 1997)*.................................................................................... 1

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.,*
   *239 F.3d 1225 (Fed. Cir. 2001)*.................................................................................. 11

# I.    <u>INTRODUCTION</u>

Plaintiffs IV[1] and Defendants Nikon[2] and Canon[3] dispute the meaning of claim terms from three patents that are asserted in both cases.[4] For the reasons set forth herein, the Court should find no construction is necessary or adopt IV's proposals and reject Defendants' proposals.

# II.    <u>LEGAL STANDARDS</u>

Claim construction is a question of law to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995). A claim term should be construed in a manner consistent with its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). Courts are not, however, obligated to construe terms with ordinary meanings, *see O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008), or engage in "an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

# III.    <u>ASSERTED WI-FI PATENTS AND DISPUTED TERMS</u>

The three asserted Wi-Fi patents—U.S. Pat. Nos. 5,712,870; 6,754,195; and 6,977,944—all generally relate to wireless networking technologies. Wireless networks connect devices, such as laptop computers, mobile phones, cameras, and other electronics, to each other and to "access points"—a wireless network hub that connects many wireless devices to a local network or to the

---

[1] Intellectual Ventures I LLC and Intellectual Ventures II LLC.
[2] Nikon Corp., Nikon Americas Inc., and Nikon Inc.
[3] Canon Inc., Canon USA, Inc., and Canon Solutions America, Inc.
[4] Because not all terms are proposed in both cases, IV refers to Defendants when discussing overlapping terms and Nikon or Canon when a term is at issue in only one case. All disputed Wi-Fi terms were proposed by the Defendants, except for those that the parties agree should be construed under 35 U.S.C. § 112, ¶ 6. For the Court's convenience, a summary of the Wi-Fi terms is attached to this brief as Appendix A, based upon the Joint Claim Construction Charts submitted in each case and revisions made in light of subsequent discussions between the parties.

Internet. Devices and access points communicate through radio signals, broadcast on particular frequencies. These signals encode "frames," i.e. packets, with information arranged in specific patterns and fields. For instance, frames generally include a field for a destination address, specifying to whom the frame is being sent. The exact order and nature of the fields in each frame, however, are specified by the relevant wireless standard.

The background standards for the patents-in-suit are those issued by the IEEE 802.11 wireless networking working group, often called "wi-fi." The first IEEE standard was published in 1997 and the IEEE continued to release subsequent standards, typically with faster transmission rates using additional technology, including that developed by the inventors of the patents-in-suit.

## A. The '870 Patent

The '870 patent, which was filed on July 31, 1995, is directed to a device for detecting and decoding packets, i.e. frames, in a wireless network. In particular, the '870 patent teaches a transceiver that may acquire and decode the preamble, header, and data, and check fields of a packet transmitted using BPSK and QPSK[5] modulation. The transceiver includes antennae, RF/IF converters, amplifiers, modulator/demodulators, and a baseband processor (which itself includes analog-to-digital converters, spreader/despreaders, and other components), all of which comprise a device that acquires and decodes incoming packets from radio waves and transmits outgoing packets by radio waves.

### 1. "single device" – Claims 1, 3, 10, 17-19

| IV's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed and the preamble is not limiting. Alternatively: <br><br> "single mechanism, tool, or other piece of equipment designed for a specific use, which may but need not be | "a single packaged integrated circuit" |

---

[5] Binary Phase Shift Keyed and Quarternary (or Quadrature) Phase Shift Keyed modulation.

| IV's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| monolithic" | |

IV respectfully requests that the Court find that the term "single device" need not be construed. First, because both sides have included "single" in the proposed constructions, the dispute between the parties appears limited to the meaning of the term "device." But "device" is an ordinary English word and is readily understandable by both persons with ordinary skill in the art and a jury.[6] Furthermore, "device" need not be construed because it is a term in the preamble of the claims and is not limiting. Preambles are not limiting unless they "recite[] essential structure or steps" or are "necessary to give life, meaning, and vitality to the claim." *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). In the '870 patent, the body of the claims "define[] a structurally complete invention" comprised of five elements in each of the independent claims, *see id.*, while the term "device" in the preamble merely serves as "a shorthand way of referring back to the [five] structural elements." *See Ravo & Nicolo v. Covidien LP*, C.A. No. 11-CV-1637, 2014 WL 198551, at *2-*3 (W.D. Pa. Jan. 16, 2014) (declining to construe the term "surgical device" after finding it a non-limiting portion of several preambles). Consequently, the preamble is not limiting and there is no need for the Court to construe the term "single device."

If, however, the Court determines that a construction is required, IV's proposal is appropriate. A "device" is a "mechanism, tool, or other piece of equipment designed for specific uses." (*See* Michaels Decl., Ex. 1, *McGraw-Hill Dictionary of Scientific and Technical Terms* 553 (Sybil P. Parker ed., 5th ed. 1994) (defining "device").) Moreover, because dependent claims 8

---

[6] *See, e.g.*, *Superspeed, L.L.C. v. Google, Inc.*, C.A. No. 12-CV-1688, 2014 WL 129225, at *9 (S.D. Tex. Jan. 14, 2014) (finding "device" need not be construed); *Sprint Commc'ns Co. v. Comcast Cable Commc'ns LLC*, C.A. No. 11-CV-2684, 2014 WL 5089401, at *21 (D. Kan. Oct. 9, 2014) (declining to construe "device").

and 19 require that "the single device" be a "single monolithic device," the device recited in the independent claims may, but need not be, monolithic. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed.Cir. 2004) ("[W]here the limitation that is sought to be `read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest."); *see also* Williams Decl. ¶ 19.  Defendants' proposal, on the other hand, ignores components disclosed in the '870 patent that are not part of an integrated circuit, such as "dual antennae 20, 22," (Ex.[7] J1 at 4:59-64), and attempts to read in additional limitations, such as "packaged" and "integrated" into the general term "device;" thus, it should be rejected.

### 2. "the demodulated data signal" – Claims 1, 10, 17

| IV's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed.  Alternatively: "demodulated data portion" | "the demodulated header portion and the demodulated data portion" |

The "demodulated data signal" term needs no construction when viewed in context of the claims.  For instance, Claim 10 of the '870 patent recites in relevant part (emphasis added):

> …
> an analog receiver for receiving a spread spectrum modulated ***signal having a header portion and a data portion***;
> …
> a digital demodulator for binary phase shift keyed (BPSK) demodulation of ***said header portion*** and quaternary phase shift keyed (QPSK) demodulation of ***said data portion***;
> an interface for providing ***the demodulated data signal*** to a media access control (MAC) layer.

The claim expressly recites a "signal having a header portion and a data portion" and indicates that the header portion of the signal and the data portion of the signal are demodulated separately, using different demodulation techniques.  A person having ordinary skill in the art would understand that "the demodulated ***data*** signal" refers to the "data portion" of the signal, decoded using QPSK

---

[7] Unless otherwise noted, "Ex." refers to exhibits to the concurrently filed Joint Appendix.

demodulation. Consequently, even if construed, "the demodulated data signal" means "demodulated data portion" of the signal, as IV proposes.

Defendants' proposal, in contrast, ignores the distinction made between the "header portion" and "data portion" of the signal. The header portion contains "preamble/sync, unique work, signal field, service field, length field, and a CRC field." (Ex. J1 at 11:14-16.) And the demodulated header fields are used to control reception of the signal: "As each field[] [making up the header] is detected, the received data is stored into internal registers," "the signaling field, when detected, is used to switch the receiver modulator/demodulator between BPSK and QPSK," and the length field "is used to track the incoming bits of the data packet and to signal the MAC layer when the last bit of the packet is received." (Ex. J1 at 11:54-67.) Thus, the header information is used in the physical layer and need not be sent to the MAC layer.[8] Consequently, Defendants' proposed additional limitation—requiring that the demodulated header portion be provided to a MAC layer—does not match the specification and, thus, should be rejected.

### 3. "spread spectrum" – Claims 1, 10, 17

| IV's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed. Alternatively: "a technique by which a signal is spread in the frequency domain" | "a method of transmission in which the bandwidth occupied by the transmitted signal is substantially wider than the rate of the original data" |

The term "spread spectrum" should not be construed, because it refers to a well-known family of wireless communications techniques. *See* Williams Decl. ¶ 38. Indeed, numerous lengthy texts and treatises are dedicated entirely to exploring the topic of "spread spectrum"

---

[8] Network "layers" are a conceptual model used to partition networking architecture into abstraction layers. The MAC layer provides addressing and channel access control mechanisms, while the physical layer handles the actual transmission/reception of signals.

communications.[9]  Requiring the parties to boil down an entire field of communications techniques into a single phrase invites over-simplification, and is unlikely to resolve any infringement or validity disputes.

Nonetheless, should the Court determine that "spread spectrum" requires construction, IV's proposal captures the essence of the technique—"spread[ing]" the signal across a "spectrum" of radio frequencies, i.e. in the frequency domain.[10]  Defendants' proposal, on the other hand, injects uncertainty into the term by requiring a bandwidth be "substantially wider" than a data rate without providing any metric for what that means.  And Defendants' proposal is incompatible with certain spread spectrum techniques, e.g. frequency hopping spread spectrum communications.  *See* Williams Decl. ¶ 39.  Thus, Defendants' proposal should be rejected.

### 4.  "comprising a single device having" – Claims 1, 10, 17

| IV's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction needed and the preamble is not limiting.  Alternatively: | The term "comprising" is a legal term of art requiring no construction. |
| "a single device including at least" | The remainder of the term should be construed as: "a single device with only" |

The term "comprising a single device having" does not require construction because it is located only in the preamble of claim 10 and, as discussed above, the preamble is not limiting. *See, e.g.*, *Synopsys Inc. v. Mentor Graphics Corp.*, C.A. No. 12-CV-06467, 2014 WL 4760362, at *2 (N.D. Cal. Sept. 24, 2014) (noting the court had declined to construe terms in a preamble where the preamble was not limiting).  Nonetheless, should the Court determine that the term warrants

---

[9] *See, e.g.*, Simon, et al., *Spread Spectrum Communications Handbook, Revised Edition* (1994) (1228 pages); Ziemer, *Introduction to Spread Spectrum Communications* (1995) (695 pages); Dixon, *Spread Spectrum Systems with Commercial Applications* (1994) (592 pages).

[10] IV's proposal is also consistent with technical definitions.  (*See, e.g.*, Michaels Decl., Ex. 7, Douglas E. Comer, *Computer Networks and Internets* 471 (1997) (defining "spread spectrum" as a "transmission technique" that uses "a set of frequencies, either at the same time or by changing from one to another").)

construction, the Court should not endorse Defendants' attempt to limit the claims to an exclusive list of components. The embodiments disclosed in the specification include components other than those specifically recited, including, for instance, "correlator circuits 84, 86," "cartesian to polar converter 88," "phase locked carrier tracking loop 108," and "data descrambler 104." (Ex. J1 at 7:1-8:52, Fig. 3.) And even if it "does not convey the open-ended meaning as strongly as 'comprising,'" the transition "'having' can also make a claim open." *See Crystal Semiconductor v. Tritech Microelectronics*, 246 F.3d 1336, 1348 (Fed. Cir. 2001). Here, where the transition "having" almost immediately follows the presumptively open transition "comprising," the language of the claim indicates that it is open-ended. *See, e.g.*, *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). Consequently, Defendants' attempt to construe "comprising a single device having" as close-ended is contrary to law as well as to the disclosed embodiments, and should be rejected.

### 5. "analog receiver" – Claims 10, 17

| IV's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed. Alternatively: "a device for receiving a transmitted analog radio frequency signal" | "analog circuitry that receives a transmitted radio frequency analog signal and outputs a corresponding analog signal" |

The term "analog receiver" is straightforward and needs no construction. A receiver is "any device which receives a transmission signal," (*see* Michaels Decl., Ex. 2, Harry Newton, *Newton's Telecom Dictionary* 823 (6th ed. 1993)), or "the part of a telecommunication system that converts transmitted waves into a desired form of output." (*See* Michaels Decl., Ex. 3, *Dictionary of Electronics* 474-75 (Valerie Illingworth ed., 3d ed. 1998).) Moreover, because the '870 patent is "related generally to receivers for acquiring radio-frequency signals," (Ex. J1 at 1:5-9), a person of ordinary skill would understand that "analog" refers to analog radio-frequency signals.

Consequently, if the Court determines construction is appropriate, IV's proposed construction reflects the understanding of a person having ordinary skill in the art.

Defendants' construction is incorrect because receivers "convert[] transmitted waves into a desired form of output;" they are not limited to outputting analog signals, (*see id.*), nor is the form of output recited in the claims. Moreover, nothing in the patent or ordinary usage limits a receiver to pure circuitry. *See* Williams Decl. ¶ 32. In fact, in alternative embodiments, many functions in the invention can be performed by "software driven devices." (Ex. J1 at 6:50-62.) Finally, Defendants' construction improperly imports method steps—"analog circuitry that *receives* … and *outputs*"—into an apparatus claim and thus should be rejected.

### 6. "timer for transitioning between the BPSK demodulation and the QPSK demodulation" – Claims 10, 17

| IV's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed. Alternatively: "timing hardware and/or software for transitioning between BPSK demodulation and QPSK demodulation" | "A circuit that measures a time interval and dictates when a transition between BPSK demodulation and QPSK demodulation is to be made" |

The term "timer for transitioning" is straightforward and requires no construction; and the remaining portion of the term—"between the BPSK demodulation and the QPSK demodulation"— is included in both proposed constructions and is not in dispute. If the Court determines a construction is required, however, Defendant's proposal should be rejected because it adds limitations—"measures a time interval and dictates when a transition…"—beyond the claims and inconsistent with the specification. Nothing in the claims as understood by one of ordinary skill in the art requires measuring or dictating, and the transition between BPSK and QPSK demodulation is influenced by multiple elements including, for instance, "the signaling field." (*See* Ex. J1 at 9:60-63.); *see* Williams Decl. ¶ 34. The testimony of Mr. Al Petrick, the inventor of the '870

patent, also indicates that timers alone do not "dictate" events.[11]  Nor do the claims necessarily require that the timer be strictly in the form of "a circuit that measures a time interval," as Defendants propose.  *See* Williams Decl. ¶ 34.  In contrast, IV's proposed construction accords with the disclosed invention and claims, (*see, e.g.*, Ex. J1 at 9:45-10:5 ("the signaling field, when detected, is used to switch the receiver modulator / demodulator between BPSK and QPSK at the correct time with respect to the data portion of the packet")), and should be adopted.

### 7.  "direct sequence spread spectrum" – Claim 10

| IV's Proposed Construction | Nikon's Proposed Construction |
| --- | --- |
| No construction needed and the preamble is not limiting.  Alternatively:<br><br>"a spread spectrum communication, in which the signal to be transmitted is modulated with a pseudorandom noise ("PN") code" | "a spread spectrum communication, in which the signal to be transmitted is modulated with a pseudorandom noise ("PN") code" |

The term "direct sequence spread spectrum" does not require construction because, as with the term "spread spectrum," it is a broad technical concept,[12] construction of which does not resolve any dispute.  Moreover, it is recited only in preambles of claims and, as discussed above, the preamble is not limiting and need not be construed.  *See, e.g.*, *Synopsys Inc. v. Mentor Graphics Corp.*  Nonetheless, should the Court determine that the term warrants construction, IV and Nikon have agreed upon a construction.

---

[11] (*See* Michaels Decl., Ex. 6, Petrick Dep. Tr. at 71:25-74:24 (Q: "And when you say timer, what do you mean by that?"  A: ". . . It's counting something in time and some events happen and it triggers something to correct."  Q: "It's a digital stopwatch?"  A: "Not that trivial." . . . . Q: "…Can you just explain that in a little bit more detail?" A: ". . . that timer goes and it sets a flag and says, you need to adjust this.").)

[12] As with "spread spectrum," there are lengthy treatises and texts devoted to direct sequence spread spectrum techniques. *See, e.g.*, Jain, *Direct Sequence Spread Spectrum Signalling* (1978) (344 pages); Smythe, *Direct Sequence Spread Spectrum Techniques in Local Area Networks* (1985) (258 pages).

**8. "means for receiving an analog signal having modulated thereon in a spread spectrum format a message having a header portion and a data portion" – Claim 1**

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| Not indefinite, not lacking written description support, and to be construed under § 112, ¶ 6.<br><br>Function: receiving an analog signal having modulated thereon in a spread spectrum format a message having a header portion and a data portion<br><br>Corresponding structure: antennae 20 and/or 22 in Fig. 2 and description of same in specification, e.g. 4:59-64, 5:44-54 | To be construed under §112, ¶ 6. This claim is indefinite because there is no corresponding structure in the specification for performing the claimed function. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308-09 (Fed. Cir. 1998).<br><br>Function: receiving an analog signal having modulated thereon in a spread spectrum format a message having a header portion and a data portion<br><br>Corresponding structure: None |

Canon argues that this term is indefinite for lack of corresponding structure. Canon is incorrect. A person of ordinary skill in the art would have understood that antennae 20 and/or 22 in Figure 2 of the '870 patent specification are structure for performing the claimed function. *See* Williams Decl. ¶¶ 21-22. Additionally, the '870 patent teaches that "a transceiver using one aspect of the present invention *may* include dual antennae." (Ex. J1 at 4:59-64 (emphasis added); *see also id.* at 5:44-54.) Thus Canon's proposal should be rejected. *See, e.g.*, *S3 Inc. v. nVidia Corp.*, 259 F.3d 1364, 1370-71 (Fed. Cir. 2001) (reversing a finding of indefiniteness of the term "means . . . for selectively receiving" notwithstanding the fact that "the electronic structure of the selector and the details of its electronic operation are not described in the specification," because of testimony that "persons of skill in this field would readily recognize that the selector as shown in the specification is an electronic device such as a simple multiplexor, whose structure is well known").

### 9. "means for converting said analog signal into a digital signal" – Claim 1

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| To be construed under § 112, ¶ 6. | This term should be construed under §112, ¶ 6. |
| Function: converting said analog signal into a digital signal | Function: converting said analog signal into a digital signal |
| Corresponding structure: A/D converter 54 and/or 56 and description of same in specification | Corresponding structure: elements 54 and 56 of Figure 2 and col. 6:67-7:11 |

The dispute for this term centers on whether the corresponding structure requires both 54 and 56, as Canon contends, or whether 54 and/or 56 are sufficient to perform the function, as IV contends. A/D (analog-to-digital) converters 54 and/or 56 in Figure 2 of the specification are structure for converting an analog signal into a digital signal. (*See* Ex. J1 at 6:63-67.) One of ordinary skill would have readily understood that the corresponding structure for converting an analog signal into a digital signal could be 54, or 56, or both. *See* Williams Decl. ¶ 24. Canon's proposed construction requires two A/D converters, even though a single A/D converter is sufficient to perform the claimed function, and thus should be rejected. *See, e.g.*, *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Under § 112, ¶ 6, a court may not import . . . structural limitations from the written description that are unnecessary to perform the claimed function.").

### 10. "means for demodulating the header of the digital signal using digital binary phase shift keyed (BPSK) demodulation and for demodulating the data portion of the same message using quarterary phrase shift keyed demodulation (QPSK)" – Claim 1

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| To be construed under § 112, ¶ 6. | This term should be construed under § 112, ¶ 6. |
| Function: demodulating the header of the digital signal using digital binary phrase shift keyed (BPSK) demodulation and for demodulating the data portion of the same message using quarterary phrase shift keyed | Function: demodulating the header of the digital signal using digital binary phrase shift keyed (BPSK) demodulation and for demodulating the data portion of the same message using quaternary phrase shift keyed |

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| modulation (QPSK). | modulation (QPSK). |
| Corresponding structure: PSK demodulator 100 in Figure 3 and description of the same in specification, e.g., 8:3-13; and/or element 60 of Figure 2 and description of the same in specification, e.g., 5:28-30 | Corresponding structure: elements 58 and 60 of Figure 2 and col. 5:24-30. |

The parties dispute whether element 58 of Figure 2 is part of the necessary structure for performing the claimed function, as Canon contends, and also dispute whether element 100 in Figure 3 is itself sufficient structure for performing the claimed function, as IV contends. At the time of the invention, one of ordinary skill in the art would have understood that, in the context of the patent, PSK demodulator 100 in Figure 3 and/or element 60 in Figure 2 constitute structure for performing the claimed function. *See* Williams Decl. ¶ 25. (*See also* Ex. J1 at 8:3-10 ("the polar signal produced by the cartesian to polar converter 88 is provided to a PSK demodulator 100 . . . . The PSK demodulator can demodulate both BPSK and QPSK signaling."); *id.* at 5:28-30.) Canon is thus incorrect in failing to include element 100 as corresponding structure.

Furthermore, although Canon includes element 58 of Figure 2 as structure for this function, element 58 is a despreader rather than a demodulator. *See* Williams Decl. ¶ 26. Both Figure 2—which labels element 58 "despread"—and the accompanying description distinguish despreaders from demodulators. (Ex. J1 at 5:25-30 (" . . . despreads the spread spectrum signal through a despreader 58. The despread signal may be demodulated by a demodulator . . . .").

### 11. "means contained on said single device for timing a transition from BPSK mosulation [sic] to QPSK modulation" – Claim 1

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| Not indefinite, not lacking written description support, and to be construed under § 112, ¶ 6. | This term should be construed under § 112, ¶ 6. This claim is indefinite because there is no corresponding structure in the specification for performing the claimed function. *Chiuminatta* |
| Function: timing a transition from BPSK modulation to QPSK modulation | |

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| <u>Corresponding structure</u>: processor interface 114 in Fig. 3 and description of same in specification | *Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308-09 (Fed. Cir. 1998). <br><br> <u>Function</u>: timing a transition from BPSK modulation to QPSK modulation <br><br> <u>Corresponding structure</u>: None |

A person of ordinary skill in the art would have understood that processor interface 114 in Figure 3 constitutes structure for performing the claimed function.  And the '870 patent describes the operation of the processor interface 114; for instance, "the signaling field, when detected, is used to switch the receiver modulator/demodulator between BPSK and QPSK at the correct time with respect to the data portion of the packet."  (Ex. J1 at 9:45-63; *see also id.* at 6:50-54, 9:18-22.)  *See also* Williams Decl. ¶¶ 28-29; note 11, *supra*, (quoting the inventor, Mr. Petrick).  One of ordinary skill would have understood the '870 patent specification to disclose adequate structure; thus, Canon's claim of indefiniteness should be rejected.  *See S3 Inc.*, 259 F.3d at 1370-71.

### 12. "means for adjusting said means for timing to account for headers of variable length" – Claim 2

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| To be construed under § 112, ¶ 6. <br><br> <u>Function</u>: adjusting said means for timing to account for headers of variable length <br><br> <u>Corresponding structure</u>: processor interface 114 in Fig. 3 and description of same in specification | This term should be construed under § 112, ¶ 6. This claim is indefinite because there is no corresponding structure in the specification for performing the claimed function. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308-09 (Fed. Cir. 1998). <br><br> <u>Function</u>: adjusting said means for timing to account for headers of variable length <br><br> <u>Corresponding structure</u>: None |

Canon contends that this term in Claim 2 of the '870 patent is indefinite for not disclosing a structure that performs that function.  Canon is incorrect; processor interface 114 in Figure 3 constitutes structure sufficient to perform the claimed function. And the '870 patent describes the

operation of that structure, teaching that "the timing of switching the receiver from one signaling format to another is time critical . . . the number of fields in the header may be user selectable". (*See* Ex. J1 at 9:18-24; *id.* at 9:45-63.)  *See also* Williams Decl. ¶ 30.  Thus, Canon's proposal of indefiniteness should be rejected.  *See, e.g.*, *S3 Inc.*, 259 F.3d at 1370-71.

## B. <u>The '944 Patent</u>

The '944 patent is directed to a technique for avoiding collisions—interference caused by simultaneous transmissions from multiple devices on the same frequency—in a communications network with two different types of devices.  In the embodiment disclosed, the network includes (1) devices that use legacy modulation and cannot detect transmissions sent using the much-faster enhanced modulation, and (2) devices that use both enhanced and legacy modulation.

In such a network, legacy devices cannot avoid collisions by simply refraining from transmitting when they detect other radio transmissions, because they cannot detect transmissions from enhanced devices.  However, even legacy devices can virtually track whether the network is free.  Before the invention of '944 patent,[13] wireless devices used "ready-to-send" (RTS) and "clear-to-send" (CTS) frames for this purpose:  the transmitting station sends a RTS frame to the receiving station, then, if no other stations nearby are transmitting, the receiving station responds with a CTS frame, signaling that data transmission can begin.  Both the RTS and CTS frames contain a duration field indicating the expected length of the exchange.  Because the RTS and CTS frames are sent using the legacy modulation format, all stations track the duration fields, using a "network allocation vector" (NAV) counter, and refrain from transmitting for the duration. Prefacing each exchange with two legacy frames, however, incurs significant overhead.

As an alternative, the inventors of the '944 patent developed the "CTS-to-self" mechanism. "CTS-to-self" allows a transmitting station to "reserve" time for a data exchange by sending a CTS

---

[13] The '944 patent claims priority to a provisional application filed on January 12, 2002.

frame to itself, avoiding the overhead of the double-frame exchange in the RTS/CTS method. Additionally, by sending the CTS frame using legacy modulation techniques, the CTS-to-self method communicates with all stations on the network, including older stations that would not detect data transmissions sent using newer, faster modulation techniques.

### 1. "data frame"[14] – Claims 1, 7, 11

| IV's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Not indefinite, not lacking written description support, and no construction needed. Alternatively:<br><br>"data encapsulated into a discrete structure for communication over a network as an independent unit" | Invalid under § 112, ¶¶ 1 and/or 2 as indefinite and/or lacking written description. |

Claim 1 of the '944 patent requires at least one "data frame." This is a straightforward term that requires no construction. A data frame is precisely what it sounds like—a frame, also known as a packet, designed to contain data for transmission in a network. Moreover, the 1997 IEEE 802.11 specification, the background for the invention in the '944 patent, (Ex. J3 at 1:24-36), describes and uses data frames. (*See, e.g.*, Michaels Decl., Ex. 4, IEEE Std 802.11-1997, § 7.2.2 ("Data frames").) And "data frame" was a commonly used term in networking standards and technical literature when the '944 patent was filed, including, for instance, the Ethernet network standard (IEEE 802.3), the Token Ring network standard (IEEE 802.5), and the distributed-queue dual-bus network standard (IEEE 802.6). *See* Williams Decl. ¶ 51. Consequently, "data frame" would be readily understood by a person having ordinary skill in the art and needs no construction.

Nonetheless, the '944 patent explains "data frame:" when large files, such as text files, are transmitted over "a packet-switched network," they are generally "transmitted in small pieces,"

---

[14] This term is also being disputed in a series of related cases pending before Judge Stark in the District of Delaware—the lead case is *Intellectual Ventures I LLC v. AT&T Mobility LLC, et al.*, C.A. No. 12-CV-193-LPS. Briefing and argument in that litigation is complete and IV will submit copies of briefing and the *Markman* hearing transcript at the Court's request.

each of which is "encapsulated into a data structure called a 'data frame' and each data frame traverses shared communications network 401 independently of the other data frames." (Ex. J3 at 4:36-51.) And this explanation reflects the meaning that "data frame" has to a person having ordinary skill in the art. Thus, if the Court determines a construction is required, the patentee's explanation, as reflected in IV's proposal, should be adopted.

2. **"transmitting said first signal in accordance with a first modulation scheme on said shared-communications medium after said second signal" – Claim 7**

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| No further construction required beyond the agreed construction of "modulation scheme." | Invalid under § 112, ¶¶ 1 and/or 2 as indefinite and/or lacking written description. |

Canon contends that this term in Claim 7 of the '944 patent is indefinite. IV proposes that this term should be given its plain meaning, as would have been reasonably certain to one of ordinary skill in the art at the time of the '944 invention, and would be understood by lay jurors in the context of the '944 patent, particularly given that the parties have agreed upon a separate construction of "modulation scheme." *See* Williams Decl. ¶¶ 55-56; (*see also* Ex. J3 at 3:47-61.) As such, this term is not indefinite, and Canon's proposal of indefiniteness should be rejected.

3. **"transmitting said third signal in accordance with said second modulation scheme on said shared-communications medium after said first signal" – Claim 19**

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| Not indefinite, not lacking written description, and no construction needed. Alternatively: | Invalid under § 112, ¶¶ 1 and/or 2 as indefinite and/or lacking written description. |
| "transmitting said third signal after said first signal on said shared-communications medium, where said third signal is transmitted in accordance with said second modulation scheme" | |

Canon contends that this term in Claim 19 of the '944 patent is indefinite. Canon is incorrect; this term would have been easily understood by one of ordinary skill in the art at the time of the '944 invention, particularly given that the parties have agreed upon a separate

construction of "modulation scheme." *See* Williams Decl. ¶ 59. And element 1108 of Figure 11 depicts the associated process step, which would be "clear to those skilled in the art how to perform." (Ex. J3 at 12:28-68.) As such, Canon's proposal of indefiniteness should be rejected.

## C. The '195 Patent

The '195 patent is directed to a wireless communication network with a dual packet configuration, where the header portion of the packet is transmitted at a single-carrier modulation scheme and the data portion of the packet is transmitted at a faster, multi-carrier modulation scheme. Such a configuration allows newer devices and legacy devices to communicate via headers transmitted using single-carrier modulation, while still enabling newer devices to take advantage of faster multi-carrier modulation. Dual packet configurations, however, need to acquire both the single-carrier and multi-carrier waveforms. Traditionally, signal acquisition was performed by employing one preamble for the single-carrier waveform and a second preamble for the multi-carrier waveform—a receiver could estimate the phase, frequency, timing, spectrum (including multi-path), and power of the transmitted signal for each waveform based on the respective preamble. (Ex. J2 at 1:52-2:21.) The estimates could be used to remove distortion, so that the receiver approximates the transmitted signal. (*See id.*) The system disclosed in the '195 patent, however, allows information from the first preamble (and single-carrier waveform) to be re-used for the multi-carrier waveform by shaping both waveforms so there is a known relationship—"the known pulse shape used by the transmitter during the single-carrier preamble and header," (*id.* at 12:50-53)—between them.

### 1. "configured to" – Claim 1

| IV's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed. Alternatively: "designed to" | "designed or programmed, and can be enabled by a user, to (perform a function)" |

- 17 -

"Configured to" is ordinary and straightforward English, used in an ordinary manner throughout the specification; it needs no construction. (*See* Ex. J2 at 1:15-18, 2:44-49, 7:10-11.) Nonetheless, if the Court determines a construction is warranted, the appropriate construction is "designed to," which is a synonym of "configured to." *See, e.g.*, *Aspex Eyewear v. Marchon Eyewear*, 672 F.3d 1335, 1349 (Fed. Cir. 2007).

The Court should reject Defendants' proposal to re-define an ordinary English term and add an entirely new limitation to the claim. Defendants appear to agree with IV that "configured to" means "designed to," but also go on to add "programmed" and require that the wireless communication system in Claim 1 "can be enabled by a user." But nothing in the claims or the specification of the '195 patent even mentions "a user," much less requires that the system "can be enabled by a user." In fact, the nature of the system disclosed in the '195 patent—a system designed to send and receive mixed waveform radio signals, indiscernible to naked human senses—suggests an automatic system, because users will be unable to determine when to enable the system. *See also* Williams Decl. ¶¶ 41-40. Thus, Defendants' proposal adds limitations inconsistent with the specification and should be rejected.

### 2. "channel impulse response estimate obtainable from the first portion is reusable for acquisition of the second portion" – Claim 1

| IV's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed. Alternatively: "channel impulse response estimate that can be obtained from the first portion can be used for acquisition of the second portion" | "channel impulse response estimated from the first portion to acquire the first portion can also be used to acquire the second portion" |

No construction is needed for this term, because Defendants' proposed construction raises no issues beyond the interpretation of common English. Specifically, Defendants' seek to redefine "channel impulse response estimate *obtainable* from the first portion" to "channel impulse

response *estimated from the first portion*."  This proposed construction is nothing more than an attempt to transform an apparatus claim into a method claim by redefining a capability ("obtainable") as a mandatory action.  And Defendants also seek to add a limitation, by requiring that estimate be taken "to acquire the first portion," which is not recited by the claims.  *See* Williams Decl. ¶ 42.  But Defendants' proposal does not clarify the "ordinary and customary meaning" of the claim; rather, their proposal only muddies the waters, and should be rejected. If the Court nonetheless determines a construction is required, IV's construction, which states that the channel impulse response estimate "can be obtained from the first portion," is the natural understanding of the claim language and should be adopted.

### 3. "transmitter maintains power, carrier phase, carrier frequency, timing, and multi-path spectrum" – Claim 2

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| Not indefinite, not lacking written description support, and no construction needed.  Alternatively:<br><br>"transmitter maintains power, carrier phase, carrier frequency, timing, and parameters relating to the multi-path spectrum" | Invalid under § 112, ¶¶ 1 and/or 2 as indefinite and/or lacking written description. |

Canon contends that this term in Claim 2 of the '195 patent is indefinite.  At the time of invention, in the context of the patent, one of ordinary skill would have understood that maintaining multi-path spectrum means maintaining parameters relating to the multi-path spectrum.  *See* Williams Decl. ¶¶ 44-45.  Moreover, the specification clarifies:

> the *multi-path information* determined by the single-carrier receiver is re-used to enable a smooth transition between the packet portions of the incoming signal.  In particular, the AGC (power), carrier frequency, carrier phase, *equalizer*, and timing *parameters from the single-carrier receiver are used by the multi-carrier receiver* to receive the incoming signal.  The OFDM multi-carrier receiver need not re-acquire the signal, since the information used by the single-carrier receiver is obtained and used.

(Ex. J2 at 7:13-22 (emphasis added).)  As such, this term is not indefinite.

### 4. "sufficiently long to achieve desired spectral characteristics and sufficiently short to minimize complexity" – Claim 7

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| Not indefinite, not lacking written description support and no construction needed. Alternatively: "implementable and has a small spectral distortion" | Invalid under § 112, ¶¶ 1 and/or 2 as indefinite and/or lacking written description. |

Canon contends that this term in Claim 7 of the '195 patent is indefinite. Canon is incorrect; at the time of invention, in the context of the patent, one of ordinary skill would have understood that one of the "desired spectral characteristics" is minimize spectral distortion, but that the window should remain simple enough to be implementable. *See* Williams Decl. ¶¶ 47-48. Moreover, Figures 8, 9, 10, and 11 are examples of such a continuous time window. (*See* Ex. J2 at 8:43-65.) As such, this term is not indefinite.

### 5. "kernel" – Claims 9, 11, 13, 16

| IV's Proposed Construction | Canon's Proposed Construction |
|---|---|
| Not indefinite, not lacking written description support, and no construction needed. Alternatively: "module" | Invalid under § 112, ¶¶ 1 and/or 2 as indefinite and/or lacking written description. |

"Kernel" is a common technical term and need not be construed. However, a person having ordinary skill would understand that "kernel" is a general term akin to "module." *See* Williams Decl., ¶¶ 49-50. And Figure 16 shows an "OFDM Kernel" and a "DSSS Preamble/HDR Kernel," (Ex. J2, Fig. 16), as different "blocks," i.e. modules. (*Id.* at 9:43-10:13; *see also*, Michaels Decl., Ex. 5, Webster Dep. Tr. at 93:13-94:25 ("Q: … what does kernel mean? A: The kernal ... were subsystems in the communication system which were of the general conventional format for a single-carrier -- with a single-carrier kernal and a multi-carrier for the multi-carrier kernal.").) As such, Canon's proposal of indefiniteness should be rejected.

Date: October 17, 2014

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com

Matthew D. Powers (admitted *pro hac vice*)
Steven S. Cherensky (admitted *pro hac vice*)
Stefani C. Smith (admitted *pro hac vice*)
Sam Kim (admitted *pro hac vice*)
Andrew C. Michaels (admitted *pro hac vice*)
Samantha A. Jameson (admitted *pro hac vice*)
Lital Leichtag-Fuks (admitted *pro hac vice*)
TENSEGRITY LAW GROUP LLP
555 Twin Dolphin Drive, Suite 360
Redwood Shores, CA 94065
Telephone: (650) 802-6000
Fax: (650) 802-6001

John M. Desmarais (admitted *pro hac vice*)
Alan S. Kellman (admitted *pro hac vice*)
Justin P.D. Wilcox (admitted *pro hac vice*)
John C. Spaccarotella (admitted *pro hac vice*)
Jeffrey S. Seddon (admitted *pro hac vice*)
Sarah E. Waidelich (admitted *pro hac vice*)
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400 (Tel)
(212) 351-3401 (Fax)
jdesmarais@desmaraisllp.com
akellman@desmaraisllp.com
jwilcox@desmaraisllp.com
jspaccarotella@desmaraisllp.com
jseddon@desmaraisllp.com
swaidelich@desmaraisllp.com

*Attorneys for Plaintiffs Intellectual Ventures I LLC*
*and Intellectual Ventures II LLC*